**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-111 (JEB)** |
| **v.** | : | |
| | : | |
| **MANDY ROBINSON-HAND,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Mandy Robinson-Hand to 45 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

## I.    Introduction

Defendant Mandy Robinson-Hand (hereinafter, "Robinson-Hand") participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on October 14, 2022, (ECF No. 27 at ¶ 6) reflects a sum of more than $2.7 million for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Robinson-Hand pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. As explained herein, a sentence of 45 days' incarceration is appropriate in this case because (1) she sent multiple text messages to her children and others, stating she was part of a war, that she needed to fight, and describing herself as a rebel; (2) Robinson-Hand continued into the Capitol after witnessing downed fencing, tear gas being deployed against rioters, and attacks on police; (3) once inside, Robinson-Hand's husband, Charles Hand, III ("C. Hand") and members of the mob chanted "take it back," as Robinson-Hand recorded that conduct with her cellphone; (4) Robinson-Hand then traveled to multiple areas within the Capitol; (5) after the riot, Robinson-Hand demonstrated a lack of remorse, sending messages to her children to "Be proud" of her and C. Hand for their actions; and (6) she later deleted her Facebook posts on January 6, announcing that "We're in the capital [sic].  Taking our house back."

The Court must also consider that Robinson-Hand's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Robinson-Hand's crime support a sentence of incarceration in this case. But for her actions alongside so many others, the riot likely would have failed. Here, Robinson-Hand's participation in a riot that succeeded in halting the Congressional certification, her messages about fighting and participating in a war, and her lack of remorse make a sentence of incarceration appropriate in this case.

## II.      Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 27 (Statement of Offense), at ¶¶ 1-7.

*Defendant Robinson-Hand's Role in the January 6, 2021 Attack on the Capitol*

On or before January 6, 2021, Robinson-Hand and C. Hand traveled to Washington, D.C., from their home in Butler, Georgia, to attend the "Stop the Steal" rally.

After attending the former President's rally, C. Hand and Robinson-Hand advanced with a crowd to the western side of Capitol.



*Picture from Robinson-Hand's cellphone[2]*

---

[2] The pictures, videos, and messages referenced in this memorandum were obtained via a consent search of Robinson-Hand's cellphone.

While on the restricted grounds on the western side of the Capitol, C. Hand and Robinson-Hand observed downed fencing (see image from Robinson-Hand's phone below), were exposed to tear gas, saw police officers holding back the mob, and also saw attacks on police officers.



*Image from a video on Robinson-Hand's phone of broken fencing*

Upon seeing the fencing, C. Hand broke off a piece of the fencing, snapped it in half, and placed a baton-like piece of fencing in his back pocket. C. Hand lost this metal baton at some point during his advance towards the Capitol.



*Side-by-side photos showing C. Hand breaking the fence and placing it in his pocket (Exhibit 1)*

A video (Exhibit 2) retrieved from Robinson-Hand's phone shows tear gas being deployed in the mob. On the video, the mob can be heard yelling at police to "Stand down." Robinson-Hand can be heard saying, "Today's the day." C. Hand, in his red University of Georgia hat, is nearby as a member of the mob yells out, "You are traitorous bitches" and another rioter yells "hang them all." The mob then begins chanting, "hang them high." At 2:06 p.m., Robinson-Hand sent two text messages to one of her contacts. Robinson-Hand stated, "We got tear gss" and "It was a bad fight. Dude im in a war."[3] Undeterred, C. Hand and Robinson-Hand watched as the mob broke through police lines and stormed up the Lower West Terrace steps.

C. Hand and Robinson-Hand advanced with the mob towards the Senate Wing Door on the northwest side of the Capitol. Shortly thereafter, at approximately 2:26 p.m., C. Hand and Robinson-Hand entered the Capitol Building through the Senate Wing Door approximately fifteen minutes after the window immediately adjacent to the door was smashed out using a riot shield.

---

[3]   Also at some point on or after January 6, Robinson-Hand wrote on her Facebook account, "We're in the Capital [sic]. Taking our house back" and "We've Been tear gassed etc." Robinson-Hand later deleted these posts. PSR ¶ 15.

The U.S. Capitol was first breached in this location by a rioter who jumped through the window over the broken glass.



*C. Hand and Robinson-Hand circled in red entering the Capitol*

Prior to entering the Capitol, Robinson-Hand took her cellphone out and recorded her entry (Exhibit 3) with C. Hand. During their entry, the crowd, including C. Hand, can be heard chanting, "take it back," as the fire alarm rings loudly in the background. The broken glass in the Senate Wing Door is also visible on Robinson-Hand's video as she is entering the Capitol. After entry, they turned to the right and walked past the shattered glass on the floor from the smashed-in window. From there, C. Hand and Robinson-Hand traveled to the Crypt.

While in the Crypt, Robinson-Hand utilized her cellphone to record C. Hand holding a flag and assisting another rioter in placing the flag in statutes' hands.



*C. Hand assisting a rioter place a flag on a statute and giving a thumbs up (Exhibit 3)*

C. Hand and Robinson-Hand then proceeded to Emancipation Hall in the Capitol Visitor Center. During C. Hand and Robinson-Hand's time in the Visitor Center, rioters were fighting police officers, throwing chairs at them, and pushing through tear gas to chase retreating officers. After seeing one of these fights, C. Hand attempted to move towards the fight but was stopped by Robinson-Hand.



*Chair being thrown at officers only feet from Robinson-Hand*



*C. Hand and Robinson-Hand pushing through tear gas*

C. Hand and Robinson-Hand then proceeded back up to the Crypt, down a hallway near the

House Wing Door, and into the Hall of Columns.

8



*C. Hand and Robinson-Hand, circled in red, traveling through the Capitol*

At 2:45 p.m., C. Hand and Robinson-Hand exited the Capitol through the South Door

Vestibule, which is located on the first floor at the southernmost part of the Capitol.



*C. Hand and Robinson-Hand exiting the Capitol*

In total, C. Hand and Robinson-Hand spent nearly 20 minutes inside of the Capitol.

However, after leaving the Capitol, C. Hand and Robinson-Hand were not done. They did not go

home; instead, they circled around to the Memorial Doors on the East side of the Capitol. While

there, Robinson-Hand sent several messages to friends and family. For example, between 3:15

p.m. and 3:17 p.m., Robinson-Hand wrote, "We stormed into the capital" and "I got no service. Got to go back and fight." In a separate message to her children, she wrote, "We're rebels. Be proud of your parents." The government has no evidence that C. Hand or Robinson-Hand did re-enter the Capitol; however, C. Hand posted on Facebook that he was on the scene from 1:30 p.m. to 4:00 p.m., and Robinson-Hand remained on the Capitol grounds with him after exiting the South Vestibule Door.) Later that evening, at 8:45 p.m., Robinson-Hand sent a text message. She wrote, "YES LOVE! WE FIGHTING FOR OUR COUNTRY."

On January 18, 2021, Robinson-Hand sent C. Hand a text message stating, "Who's asking about us? I know that January 6 was a set up. The FBI knows this, too. And I also know it was several activist groups and extreme groups who wanted chaos, and then I feel like even the governmen[t]." That same day, C. Hand sent Robinson-Hand a message stating, "Like I said it was a perfect time to be a. Part of history!" Robinson-Hand responded, "I know God sent us on that trip, and I can't allow fear, PTSD, paranoia control me because that would disobey God." Despite their statements, both C. Hand and Robinson-Hand have admitted that they knew at the time they entered the U.S. Capitol Building that they did not have permission to do so, and they paraded, picketed, or demonstrated in the Capitol Building.

*Defendant's Interview*

On March 11, 2022, Robinson-Hand gave a post-arrest interview to the FBI. During the interview, she admitted traveling to Washington D.C. with C. Hand. Robinson-Hand stated she could see the former President as he spoke, and people were in trees. She stated, "it was awesome." She said her and C. Hand left the speech before it ended and followed the crowd towards the

Capitol. Robinson-Hand said she saw people yelling at the "Justice building."[4] As they approached the Capitol, she heard bomb-like sounds, saw smoke and people that were different from those who attended the "normal" rallies for the former President. She stated, "you could feel the energy." She mentioned that everyone was mad at Vice President Pence. She mentioned that there were different types of yelling and protesting than occurred at the former President's usual rallies.

Robinson-Hand stated they went up to the top of the stairs at the Capitol. She said there was a big crowd going inside and that the police officers were not doing anything.  Robinson-Hand stated she went downstairs and that she was looking for a place to use the restroom. She said she was approached by a man in military dress and was told to get the women out of the building. Robinson-Hand said she did not feel comfortable and left the building. On her way out she observed tributes to former Senator John Lewis that were destroyed.

Robinson-Hand stated left the building and proceeded to the steps outside the Capitol. She stated there were more military-style men with walkie-talkies who were different from her and C. Hand. She thought it was very strange. Recounting the day, Robinson-Hand remarked, "It was a wild experience" and "it was pretty cool, not this part (referring to handcuffs)" and how she would tell her grandkids. She stated she did not know the certification was going on and that she was disturbed by people fighting the police and causing property damage.

*The Charges and Plea Agreement*

On March 4, 2022, the United States charged Robinson-Hand and C. Hand by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On March 11, 2022, law enforcement officers arrested them in Butler, Georgia. On March 31,

---

[4] She omitted a fact mentioned by her husband in his interview. In C. Hand's interview he stated they yelled at the Justice building, stating, "do your job."

2022, the United States charged Robinson-Hand and C. Hand by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On October 14, 2022, pursuant to a plea agreement, Robinson-Hand and C. Hand each pleaded guilty to Count Four of the Information, charging them with a violation of 40 U.S.C. § 5104(e)(2)(G).

### III.   Statutory Penalties

Robinson-Hand now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, she faces up to six months of imprisonment and a fine of up to $5,000. She must also pay $500 restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 45 days' incarceration and 36 months of probation.

### A.  The Nature and Circumstances of the Offense

"The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Robinson-Hand's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Robinson-Hand, the absence of violent or destructive acts is not a mitigating factor. Had Robinson-Hand engaged in such conduct, she would have faced additional criminal charges.

One of the most important factors in Robinson-Hand is her persistence to get into the Capitol Building. Robinson-Hand was exposed to tear gas and saw rioters being hit with tear gas. She heard rioters yelling "You are traitorous bitches" to police officers and another rioter yell "hang them all." Rioters all around Robinson-Hand then chanted, "hang them high." She saw police defending the Capitol and being assaulted by rioters. She observed her husband break fencing and place a baton-like piece in his pocket. Robinson-Hand described the scene in a message as a "war" and, despite this, she continued her march towards the Capitol as one of the foot soldiers in the war.

As Robinson-Hand entered the Capitol, she saw broken windows and heard fire alarms. Once inside, she witnessed rioters fighting police and members of the mob taking things off the wall. Robinson-Hand's reaction to violence and property destruction was to continue further into the restricted area, further into the Capitol.

Robinson-Hand was also in the Capitol for almost 20 minutes. She traveled to multiple locations including the Senate Wing Door, the Crypt, the Visitor Center, and the hallways near the House of Representatives. Even after leaving the Capitol, she did not leave the restricted grounds. She and C. Hand instead circled the Capitol and joined the mob outside the Memorial Doors just outside the Rotunda. Robinson-Hand's messages at this time reveal her state of mind after leaving the Capitol. It was not shock at the violence or fear, or regret or remorse for being part of the riot. Instead, she said, "Got to go back and fight." There cannot be a riot without the mob. Robinson-Hand's persistence to fight and remain in and around the Capitol building enabled the riot to continue.

To date, Robinson-Hand has expressed no remorse for her criminal conduct, only regret that she was arrested for it.  Despite being cooperative with law enforcement during her interview,[5] her actions in the days following January 6, 2021, paint a different picture. At 3:17 p.m., as she was part of the mob by the Memorial Doors, Robinson-Hand sent a message to her children. In the message she described herself and C. Hand as "rebels" and said that her children should "Be proud of your parents." Later that evening, after having hours to reflect on the violence and destruction she witnessed, she wrote, "WE FIGHTING FOR OUR COUNTRY." Robinson-Hand's lack of remorse continued. On January 18, 2021, she wrote, "January 6 was a set up" and that "God sent us on that trip." In March 2022, more than a year later, Robinson-Hand summarized her sentiments about January 6, telling the FBI, "It was a wild experience" and "it was pretty cool, not this part (referring to handcuffs)" and how she would tell her grandkids."  Robinson-Hand is proud of what she did that day. Her only regret is that she is being held accountable for her actions.

---

[5] The agent in the case remarked, "they were the most cooperative and polite subjects/defendants I've dealt with in my 10 years in the FBI."

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

**B.   The History and Characteristics of Robinson-Hand.**

As set forth in the PSR, Robinson-Hand's criminal history consists of a conviction in 2008 for possession with intent to distribute a controlled substance (oxycodone) and use of a communication facility in committing a felony. ECF 28 at ¶ 25. Robinson-Hand pled guilty and was sentenced to one year in jail and nine years' probation for the sale of oxycodone and five years' probation on the use of a communication device, to run concurrently. *Id*. Thus, Robinson-Hand was already convicted felon and had been on probation for nearly a decade of her life when she committed the instant offense. Her criminal history makes a lengthier sentence of incarceration appropriate.

**C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

**D.   The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Robinson-Hand participated in the riot on January 6, despite watching rioters assaulting police and seeing the destruction of property around her.  She then celebrated her participation in the riot, telling her children they should be proud of her.  More than a year later, she still regarded the riot as "pretty cool," and she has yet to make any statement expressing regret for her conduct that day.  A sentence of incarceration is warranted to underscore that her conduct was criminal, and to deter Robinson-Handy from engaging in lawless conduct in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[6] This Court must sentence Robinson-Hand based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.

Robinson-Hand has pleaded guilty to Count 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

---

[6] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those

cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For

that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

C. Hand's case is the most comparable because his conduct is similar to Robinson-Hand's conduct. The government is recommending 30 days' incarceration for C. Hand. Robinson-Hand entered at the same time, at the same location, and traveled throughout the Capitol with C. Hand. However, Robinson-Hand's text messages and social media posts before, during, and after her

entry into the Capitol are aggravating. Additionally, Robinson-Hand has a more significant criminal history with four felony convictions arising from one case. Because of these additional aggravating factors, the government is requesting 45 days' incarceration for Robinson-Hand.

In *United States v. Rafael Valadez*, 21-cr-695 (JEB), the defendant pled guilty to misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (parading, picking, or demonstrating in the Capitol building). Valadez entered the Capitol through the Senate Wing Door ten minutes after it was initially breached, he took videos of members of the mob entering the Capitol and within the Capitol, was part of the mob that pushed past officers in the Crypt, and did not express remorse for his actions. Gov. Sentencing Memo., *United States v. Rafael Valadez*, 21-cr-695 (JEB), ECF 27 at 2. The government asked for a 30-day sentence followed by 36-months of probation. *Id.* at 1. Valadez received a sentence of 30-days incarceration. *Rafael Valadez*, 21-cr-695 (JEB), ECF 30.

Like Valadez, Robinson-Hand entered the Capitol through the Senate Wing Door shortly after Valadez, she and C. Hand took several photographs and videos outside and inside the Capitol, and she did not show remorse after January 6. Similar to Valadez, Robinson-Hand should be sentenced to incarceration.

In *United States v. Clifford Meteer*, 21-cr-630 (CJN), the defendant pled guilty to misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (parading, picking, or demonstrating in the Capitol building). Meteer followed the mob that overran police officers on the Upper West Terrace and entered the Capitol through the Senate Wing Door at 2:24 p.m. Gov. Sentencing Memo., *Meteer*, 21-cr-630 (CJN), ECF 31 at 2. He was inside the Capitol for 31 minutes and paraded through multiple areas, including the Crypt. *Id.* After January 6, 2021, he made statements in interviews and posted statements on social media that showed a lack of remorse. *Id.* When

interviewed by agents, he refused to admit he was inside the Capitol. *Id.* Meteer was previously convicted of a felony and several firearms were found in his residence upon execution of a search warrant. *Id.* The government asked for a sentence of 75 days' incarceration followed by 36 months of probation. *Id.* at 1. Meteer received a sentence of 60 days' incarceration. *Meteer*, 21-cr-630 (CJN), ECF 31.

Like Meteer, Robinson-Hand followed the mob to the Capitol and entered the building through the Senate Wing Door just minutes after Meteer. Robinson-Hand was inside the building for a similar length of time and, like Meteer, paraded through multiple areas of the Capitol. Robinson-Hand also showed a lack of remorse when she told her kids they would be proud of her and C. Hand for their actions. Even after leaving the Capitol, Robinson-Hand remained feet from the building and continued to message others about how she was fighting. Over a week later, instead of asking for forgiveness, Robinson-Hand told others she believed God sent her to the Capitol. Lastly, Robinson-Hand is a convicted felon, like Meteer. The government credits her candor with law enforcement and recognizes a significant difference between Meteer and Robinson-Hand: Meteer had firearms seized from his residence. Given the similarity of their crimes, Robinson-Hand should be sentenced to 45 days' incarceration.

**V.    This Court is authorized to and should impose a term of incarceration as a condition of probation pursuant to 18 U.S.C. § 3563(b)(10).**

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[7]

Section 3563(b)(10) authorizes a sentencing court to impose one or more intervals of imprisonment as a condition of probation.  18 U.S.C. § 3653(b)(10).  Section 3563(b)(10) authorizes sentencing courts to impose up to a year (or the authorized statutory maximum) of imprisonment, which the defendant must serve during the first year of probation.  *Id.*  Thus, for a violation of 40 U.S.C. § 5104(e)(2)(G), Section 3563(b)(10) facially permits a sentencing court to require the defendant to serve up to six months in prison as a condition of probation.  *See* 40 U.S.C. § 5109; 18 U.S.C. § 3563(b)(10).  Any imprisonment term imposed as a condition of probation must be served during "nights, weekends or other intervals of time." § 3563(b)(10).

Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10));

---

[7] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

*see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation); *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999) ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).

Typically known as "intermittent confinement," a sentencing court may impose multiple intervals of imprisonment under Section 3563(b)(10).  *See Anderson*, 787 F. Supp. at 539.  Section 3563(b)(10) thus authorizes this Court to impose more than one imprisonment interval, where each such interval is no more than 14 days.  *See, e.g.*, *United States v. Cameron*, 22-cr-17 (TFH), ECF No. 36 (D.D.C. Aug. 17, 2022) (imposing 30-day imprisonment sentence (ten three-day intervals) and three years of probation); *United States v. Vuksanaj*, 21-cr-620 (BAH), ECF No. 43 (D.D.C. Apr. 29, 2022) (imposing 42-day imprisonment sentence (three 14-day intervals) and three years of probation); *United States v. Reed*, 21-cr-204 (BAH), ECF No. 177 (D.D.C. Apr. 14, 2022) (same); *United States v. McCreary*, 21-cr-125 (BAH), ECF No. 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Howell*, 21-cr-217 (TFH), ECF No. 41 (D.D.C. Mar. 8, 2022) (imposing 60-day imprisonment sentence (six 10-day intervals) and three years of probation); *United States v. Schornak*, 21-cr-278 (BAH), ECF No. 71 (D.D.C. Feb. 18, 2022) (imposing 28-day imprisonment sentence (two 14-day intervals) and three years of probation).   Imposing an intermittent confinement sentence with 45 days' of imprisonment as a condition of probation is appropriate in this case.

To be sure, earlier in the investigation of the January 6 attack on the Capitol, the government refrained from recommending intermittent confinement sentences given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a

detention facility during an ongoing global pandemic.  At this point, however, multiple jury trials have successfully occurred, *see* Standing Order No. 22-64 (BAH), at 3 (D.D.C. Nov. 9, 2022) (noting that the Court has "forg[ed] ahead" and eas[ed] the backlog" of criminal cases since the Omicron surge began to abate in February 2022), and general COVID trends appear to show a decrease in cases.[8]

## VI.    A sentence imposed for a petty offense may include both imprisonment and probation.

The government's recommended sentence of 45 days' incarceration and 36 months of probation is also permissible under 18 U.S.C. § 3561(a)(3).  As Judge Lamberth observed, Section 3561(a)(3) "permits a sentencing judge to impose a term of probation at the same time as a term of imprisonment when a defendant is sentenced to imprisonment for only a petty offense or offenses."  *Little*, 590 F.Supp.3d at 351; *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022).  Because the government has briefed a sentencing court's authority to impose a split sentence for a defendant convicted of a single petty offense in this Court and the D.C. Circuit, those arguments are not elaborated further here.[9]

## VII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 45 days' incarceration and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and

---

[8] *See* Centers for Disease Control and Prevention, COVID Data Tracker, *available at* https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last viewed Nov. 21, 2022).

[9] The defendant's appeal of the split sentence imposed in *Little* is pending.  The D.C. Circuit heard oral argument on November 2, 2022.

deters future crime by imposing restrictions on her liberty as a consequence of her behavior, while

recognizing her acceptance of responsibility for her crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:        */s/ Brian Brady*
Brian Brady
Trial Attorney, Department of Justice
DC Bar No. 1674360
1301 New York Ave. N.W., Suite 800
Washington, DC 20005
(202) 834-1916
Brian.Brady@usdoj.gov